**COZEN O'CONNOR**
Valerie D. Rojas, State Bar No. 180041
*vrojas@cozen.com*
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017
Telephone: 213.892.7900
Facsimile: 213.892.7999

Attorney for Plaintiff TRANSAMERICA
LIFE INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>FREDYA JONES,<br><br>    Defendant. | Case No.:<br><br>**PLAINTIFF TRANSAMERICA LIFE INSURANCE COMPANY'S COMPLAINT** |

Plaintiff, Transamerica Life Insurance Company, as successor by merger to Transamerica Occidental Life Insurance Company (referred to collectively herein as "Transamerica"), acting by and through its counsel, Cozen O'Connor, files this complaint for damages and declaratory relief against Fredya Jones ("Jones"), and in support thereof, states the following:

## **PARTIES**

1. Transamerica is an insurance company organized and existing under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa, and is therefore deemed to be a citizen of the State of Iowa.

2. Jones is an adult individual residing in Los Angeles, California, and is a citizen of the State of California.

LEGAL\44609071\1

## JURISDICTION AND VENUE

3. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

4. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) because the Central District of California is the judicial district in which Jones resides.

5. Venue is also proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because the Central District of California is the judicial district in which a substantial part of the acts and omissions giving rise to Transamerica's claims against Jones occurred.

## FACTS COMMON TO ALL COUNTS

6. This is an action in which Transamerica alleges fraud against Jones in connection with a claim for benefits initiated by Jones under a long-term care insurance contract with Transamerica.

**A. Jones' Certificate of Coverage with Transamerica**

7. On or about September 1, 1999, Transamerica issued a Comprehensive Long-Term Care Insurance Certificate, No. 890753690, to Jones (the "Certificate"). A true and correct copy of the Certificate, without the Application, is attached hereto as **Exhibit A**.

8. The Certificate provides coverage for Home Health Care – meaning "skilled nursing or other professional services provided in Your Home," subject to the terms and conditions of the Certificate – in the event Jones is Unable to Perform two or more Activities of Daily Living ("ADLs").

9. "Unable to Perform" an ADL means "[Jones] cannot perform it without the actual, supervisory or directional assistance of another person," meaning, among other requirements, that Jones would require the immediate physical presence of a caregiver.

10. The ADLs defined in the Certificate include Bathing, Dressing, Eating, Toileting, Transferring, Continence, and Ambulating.

11. Thus, in the event Jones required the actual, supervisory or directional assistance of another person to perform two or more of these ADLs, the Certificate would pay benefits to Jones provided Jones hired, received care from and paid for the services of an approvable caregiver to assist with the performance of the ADLs, subject to the terms and conditions of the Certificate.

12. Notably, benefits under the Certificate were only triggered if Jones incurred actual expenses for care services rendered. This meant that Jones needed to receive care in exchange for remuneration, then submit invoices and other signed and certified Proof of Loss to Transamerica in order for benefits to be paid. Transamerica was only obligated to pay benefits in the event Jones received care and incurred actual expenses for that care. The amount of benefits paid by Transamerica could not exceed the amount of Jones' actual, out-of-pocket expenditures for care. In other words, the Certificate was designed to reimburse Jones for payments she made in exchange for care she actually received, but did not offer benefits for amounts in excess of the amount actually paid by Jones.

**B. Jones' Claim for Benefits Under the Certificate**

13. On or about March 15, 2007, Jones initiated a claim for long-term care insurance benefits under the Certificate. Jones identified severe back pain as the primary basis for the claim.

14. Transamerica approved Jones' claim and began paying benefits.

15. Jones identified Monique Harris as her caregiver and represented to Transamerica that Ms. Harris provided care 12 hours per day, 7 days per week in Jones' home due to Jones' alleged inability to perform two of the ADLs defined in her Certificate.[1]

---

[1] Transamerica does not specifically identify the ADLs Jones claims to have been unable to perform here or elsewhere in this Complaint out of a desire to safeguard Jones' Protected Health Information.

3

16. Transamerica paid benefits to Jones based on her representations in signed and certified Proof of Loss forms that Ms. Harris provided care 12 hours per day, 7 days per week, and that Jones compensated Ms. Harris for her services in an amount equal to or greater than the amount of benefits paid by Transamerica.

17. In or around 2009, Jones represented to Transamerica that she changed caregivers. She identified Stella Simmons as her new caregiver. As with Ms. Harris, Jones represented to Transamerica in signed and certified Proof of Loss forms that Ms. Simmons provided care 12 hours per day, 7 days per week, and that Jones compensated Ms. Simmons for her services. Based on these and other representations, Transamerica continued paying benefits to Jones.

18. In or around 2012, Jones represented to Transamerica that her condition deteriorated. Instead of being Unable to Perform two ADLs, Jones represented that she was Unable to Perform five ADLs.

19. Moreover, in or around 2012, Jones represented in signed and certified Proof of Loss forms that the level of care she received from Ms. Simmons increased from 12 hours per day to 24 hours per day, 7 days per week. Jones further represented that she paid Ms. Simmons for the new level of care she claimed to receive. Transamerica continued paying benefits to Jones based on her representations about her claim and level of care.

20. By late 2017, Jones continually represented to Transamerica that she was unable to perform five ADLs and was receiving and paying for care 24/7 from Ms. Simmons. Transamerica continued to pay benefits.

**C. Transamerica's Investigation of Jones' Claim**

21. Beginning in late 2017, Transamerica determined that it was necessary and appropriate to investigate Jones' claim.

22. Transamerica performed an initial period of surveillance on Jones in November 2017. Jones was seen active in the community on multiple dates, driving a car, walking her dog up a steeply inclined hill, lifting objects, reaching and bending,

and exhibiting a general level of functionality that was materially inconsistent the notion that she was Unable to Perform any ADL, let alone five. She did not use a cane or walker despite representing to Transamerica that she needed these implements to Ambulate. Nor did she walk with an antalgic gait, as represented to Transamerica. Moreover, no caregiver was seen with Jones, despite her representations to Transamerica that she received care from Ms. Simmons 24/7.

23. On February 12, 2018, Transamerica sent Jones for an Independent Medical Examination ("IME") in accordance with Transamerica's contractual rights under the Certificate.

24. The IME was performed by Dr. Sean Leoni, who is board certified in Internal Medicine and Pain Management, and had no prior relationship with either Transamerica or Jones.

25. During the IME, Jones purported to suffer from significant degenerative disc disease of the lumbar spine. She utilized a walker and reported an inability to walk or stand for a prolonged period of time. She reported that she could not care for herself and had a 24/7 caregiver to assist with the performance of her ADLs. She purported to walk with an antalgic gait.

26. Based in substantial part on Jones' subjective representations and behaviors during the IME, Dr. Leoni initially opined that Jones was Unable to Perform five ADLs. In other words, it was Dr. Leoni's initial impression that Jones met the benefit triggers in her Certificate. Accordingly, Transamerica continued to pay benefits while its investigation remained open and ongoing.

27. Transamerica performed a second period of surveillance on Jones in conjunction with the IME. Transamerica's observations were inconsistent with Jones' representations to both Transamerica and Dr. Leoni.

28. Initially, Jones did not use a cane or walker, as represented to Transamerica and Dr. Leoni during the IME. In fact, throughout the entirety of the four periods of surveillance that were ultimately performed by Transamerica during

its investigation of Jones' claim (totaling 19 days of surveillance), the ***only*** time she used a walker was when she entered, participated in and exited the IME. (No cane was ever observed on any date of surveillance). Not only did Jones ***not*** use a cane or walker at other times, she was observed on video walking without a walker, cane or antalgic gait earlier on the very same date when the IME took place.

29. As with the prior period of surveillance, Jones was seen on multiple dates engaging in activities, tasks and movements that directly contradicted her ongoing representations to Transamerica that she was Unable to Perform ADLs. In the same vein, no caregiver was seen on any date or at any time, despite Jones continuing to represent to Transamerica in signed and certified Proof of Loss forms that she received and paid for care from Ms. Simmons 24/7.

30. Due to the material disconnect between Jones' reported functionality and the level of functionality seen on video, Transamerica provided the video to Dr. Leoni so he would have the benefit of all available information about Jones' alleged condition.

31. Transamerica asked Dr. Leoni whether the video changed his initial opinion concerning Jones' ability to perform ADLs. Dr. Leoni confirmed that the video did, in fact, change his opinion. He prepared an addendum to his initial IME report in which he concluded: "Obviously there is a difference between the video surveillance and how [Jones] was examined in my office. She came in with the aid of a walker…[Jones] is able to perform her ADLs without assistance."

32. On or about October 5, 2018, based on all of the information in Transamerica's possession, Transamerica denied Jones' claim for benefits effective October 17, 2018.

**D. Jones' Claim Appeal**

33. On February 9, 2019, Jones appealed the denial of her claim. In doing so, Jones sought to perpetuate the façade that her claim arose from a legitimate inability to perform ADLs, and that she received and paid for care from Ms. Simmons.

6

34. Because Jones has both a legal and contractual right of appeal, and because Transamerica's claim investigation remained ongoing despite the denial of the claim, Transamerica was obliged to consider Jones' appeal notwithstanding her pattern of untoward claim activity.

35. Ironically, however, Jones failed to pursue the appeal, once opened, with any reasonable level of diligence.

36. On February 26, 2019, in connection with the appeal, Transamerica asked Jones' primary care physician, Dr. Kenneth Landis, to complete a questionnaire in which he rendered an opinion regarding her ability to perform ADLs. Dr. Landis did not respond to this request. So, Transamerica sent the form again on March 22, 2019.

37. Transamerica also determined that it was appropriate to perform an additional period of surveillance on Jones in March 2019 in connection with her appeal and Transamerica's request for information from Dr. Landis.

38. As with Transamerica's two prior periods of surveillance, Jones was again seen active in the community on multiple dates exhibiting movements and performing tasks that were inconsistent with the notion that she was unable to perform any ADL. She did not use a cane or walker, or walk with an antalgic gait. Moreover, no caregiver was seen on any date of surveillance, despite Jones' prior representations to Transamerica that she needed, received and paid for care in the home 24/7.

39. For reasons unknown to Transamerica, Dr. Landis did not complete Transamerica's ADL questionnaire until May 7, 2019 and did not provide it to Transamerica until June 12, 2019. Curiously, in that form, Dr. Landis opined that Jones was Unable to Perform two ADLs and required care from a caregiver 24/7.

40. Dr. Landis' opinion was so irreconcilably inconsistent with Transamerica's March 2019 surveillance that, on information and belief, Jones must have misrepresented to Dr. Landis the nature and extent of her alleged functional incapacity and care needs, as she did to Dr. Leoni (who performed the IME).

7

41. In accordance with its contractual rights, Transamerica sought to obtain complete copies of Jones' medical records. This effort was confounded, however, by Jones' refusal to provide Transamerica with a signed HIPAA authorization. This refusal breached the Certificate.

42. Jones ultimately relented and, months later, provided Transamerica with a HIPAA authorization. Transamerica obtained Jones medical records, which suggested that her functionality was largely intact and did not support that she was Unable to Perform two or more ADLs.

43. Due to Jones' inexplicable delay in perfecting an appeal, Transamerica determined that one final period of surveillance was appropriate. The final period of surveillance took place late in 2019.

44. As with the three periods of surveillance that preceded it, the final period of surveillance showed Jones active in the community on multiple dates, exhibiting movements and performing tasks that were inconsistent with the notion that she was unable to perform any ADL. She did not use a cane or walker, or walk with an antalgic gait. Moreover, no caregiver was seen on any date of surveillance, despite Jones' prior representations to Transamerica that she needed, received and paid for care in the home 24/7.

45. In fact, Transamerica performed surveillance on 19 dates over the course of its investigation, and no caregiver was observed on any date despite Jones' repeated certifications to the contrary.

46. Upon completing its claim investigation and evaluating all of the information in its possession, Transamerica denied Jones' claim appeal.

47. Transamerica paid a total of $694,623.99 in benefits to Jones as a result of her knowing, intentional, willful, wanton and repeated misrepresentation of material facts to Transamerica.

48. Jones' fraudulent conduct was of such an egregious nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages.

49. Moreover, Transamerica is entitled to a declaration that the Certificate is void under the inherent power of the Court to adjust the equities between the parties due to Jones' breach of the implied covenant of good faith and fair dealing between the parties and as a means of compensating Transamerica for its losses.

50. There is, therefore, an actual, present and justiciable controversy between the parties for which there is no adequate remedy at law as to whether the Certificate is void.

## **COUNT I – FRAUD**

51. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

52. Jones misrepresented material facts knowingly, purposefully and with an intent to defraud Transamerica, including:

    a. Representing to Transamerica throughout most or all of the duration of the claim that she was eligible for benefits due to a qualifying ADL deficiency when, in fact, she suffered from no such deficiency;

    b. Forging Proof of Loss submissions in order to give Transamerica the false impression that her alleged caregivers signed forms attesting to care they provided when, in fact, they provided no such care;

    c. Representing to Transamerica throughout most or all of the duration of the claim that she received care from an eligible and approvable caregiver when, in fact, she did not; and

          d.    Representing to Transamerica throughout most or all of the duration of the claim that she incurred expenses for eligible care services when, in fact, she did not.

53. Jones made each of these misrepresentations repeatedly and with actual knowledge of its falsity.

54. Jones made each of these representations to Transamerica or to another person or entity with knowledge and intent that the false information would be communicated to Transamerica and acted upon by Transamerica for her benefit and to Transamerica's detriment.

55. Transamerica reasonably and justifiably relied on Jones' misrepresentations to Transamerica and others to its detriment when it paid benefits to Jones.

56. Jones knew Transamerica would decline to pay benefits if it knew the true nature of her claim, including her true level of functionality, the fact that she was not receiving care from any caregiver as represented, or the fact that she was not incurring expenses for the care received, if any.

57. Transamerica would, in fact, have declined to pay benefits if it knew the true nature of Jones' claim, including her true level of functionality, the fact that she was not receiving care from any caregiver as represented, or the fact that she was not paying for the care received, if any.

58. As a direct and proximate result of Jones' fraudulent misrepresentations, Transamerica paid benefits to Jones totaling $694,623.99.

59. Transamerica incurred additional losses in an amount to be determined at trial relating to the cost of investigating Jones' fraudulent claim – losses that would not have been incurred but for Jones' initial and ongoing pattern of fraudulent conduct.

## COUNT II – CIVIL THEFT

60. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

61. Jones did knowingly and intentionally deprive Transamerica of insurance benefits in the amount of $694,623.99 that should not and would not have been paid but for Jones' fraud and deceit.

62. Jones had no lawful right to receive any portion of this money, or to retain possession of the money once it was received.

63. Notwithstanding the absence of any right to receive or retain possession of the money, Jones did, in fact, receive and retain possession of the money.

64. Jones' receipt and retention of the money constituted a theft.

65. Jones knew the money was received through fraud and deceit, and that Transamerica would not have paid the money had it known the true facts about Jones' claim. Thus, Jones knew the money she received from Transamerica was stolen.

66. As a result of this theft, Jones is liable to Transamerica in the amount of $694,623.99, plus statutory treble damages, attorney's fees and costs pursuant to California Penal Code § 496(c).

## COUNT III – DECLARATION THAT THE CERTIFICATE IS VOID

67. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

68. Insurance contracts are agreements *uberrimae fidei* and are imbued with a mutual implied covenant of good faith and fair dealing.

69. By initiating and perpetuating a protracted fraud against Transamerica, Jones has breached the implied covenant and demonstrated that she is incapable of proceeding in good faith in an ongoing contractual relationship with Transamerica.

70. Accordingly, it is necessary and appropriate for the Court to exercise its inherent power to adjust the equities between the parties by declaring the Certificate void so Transamerica is not faced with a future threat of fraudulent claims.

71. In the alternative, it is necessary and appropriate for the Court to declare the Certificate void as a means of compensating Transamerica for a portion of the losses attributable to Jones' fraudulent conduct.

72. There is, therefore, and actual, present and justiciable controversy between the parties for which there is no adequate remedy at law as to whether the Certificate is void.

## **COUNT IV – RESTITUTION OF BENEFITS PAID**

73. Transamerica incorporates the preceding paragraphs of the complaint as though stated fully herein.

74. Transamerica has no present obligation to pay benefits under the Certificate due to one or more of: (1) Jones' lack of a qualifying ADL deficiency; (2) Jones' failure to receive care from any caregiver; and/or (3) Jones' failure to incur expenses for care as represented to Transamerica such that reimbursement under the Certificate could be appropriate.

75. Transamerica had no obligation to pay benefits under the Certificate during some or all of the period of Jones' claim due to one or more of: (1) Jones' lack of a qualifying ADL deficiency; (2) Jones' failure to receive care from any caregiver; and/or (3) Jones' failure to incur expenses for care as represented to Transamerica such that reimbursement under the Certificate could be appropriate.

76. Transamerica is entitled to restitution in the amount of the benefits paid by Transamerica since a date to be determined by the Court.

WHEREFORE, Transamerica respectfully demands the following relief:

1. Actual and compensatory damages in an amount to be determined at trial, plus interest;
2. Punitive damages including, but not limited to, statutory treble damages;
3. Attorney's fees;
4. The costs of litigation;

5. A judicial declaration that the Certificate is void;

6. A judicial declaration that Transamerica may retain some or all of the premium paid for the Certificate;

7. Restitution of benefits paid to Certificate since a date to be determined by the Court;

8. Such other relief as may be demonstrated at trial; and

9. Such other relief as the Court deems just and proper.

Dated:  March 11, 2020        COZEN O'CONNOR

By: */s/ Valerie D. Rojas*
Valerie D. Rojas
Attorneys for TRANSAMERICA LIFE INSURANCE COMPANY